IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. |
| | 1:11-cr-00410-RWS-RGV |
| HELEN E. HAMPTON | |

## ORDER FOR SERVICE OF FINAL REPORT, RECOMMENDATION, AND ORDER

Attached is the Final Report, Recommendation, and Order of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and Local Criminal Rule 59(2)(a)-(b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. Failure to object to this Report and Recommendation waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(D) and (H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED** and **DIRECTED**, this 5th day of March, 2012.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

HELEN E. HAMPTON

CRIMINAL CASE NO.
1:11-cr-00410-RWS-RGV

## MAGISTRATE JUDGE'S FINAL REPORT, RECOMMENDATION, AND ORDER

Defendant Helen E. Hampton ("Hampton") is charged in a three-count indictment with (1) unlawfully embezzling, stealing, abstracting, and removing mail matter while she was employed by the United States Postal Service ("USPS"), in violation of 18 U.S.C. § 1709; (2) attempting corruptly to destroy, mutilate, and conceal mail matter with the intent to impair its integrity and availability for use in an official proceeding, in violation of 18 U.S.C. § 1512(c)(1); and (3) knowingly destroying, mutilating, concealing, and covering up text messages with the intent to impede, obstruct, and influence a criminal investigation, in violation of 18 U.S.C. § 1519. [Doc. 1].[1] Pending before the Court are Hampton's motions to suppress

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

statements and evidence. [Docs. 9 & 10].[2] Following an evidentiary hearing on October 18, 2011, on Hampton's motions to suppress,[3] the parties filed post-hearing briefs, [Docs. 25, 31, & 34], and the pending motions are ready for ruling. For the following reasons, it is **RECOMMENDED** that Hampton's motions to suppress, [Docs. 9 & 10], be **DENIED**.

## I. STATEMENT OF FACTS

On November 4, 2010, an employee at the main post office in Douglasville, Georgia, who wished to remain anonymous, contacted USPS's Office of the Inspector General ("OIG"), alleging that Hampton, who had been employed as a mail carrier by the USPS for at least ten years and was also acting as a supervisor over other mail carriers at the main Douglasville post office at that time, and another USPS Douglasville employee, later identified as Amanda Poole ("Poole"), were

---

[2] Hampton has also filed a motion under seal to supplement the record with an excerpt of testimony given before the grand jury, see [Doc. 32, Docket Entry dated 01/18/2012], which the government opposes, see [Doc. 33, Docket Entry dated 01/20/2012]. Because Hampton had the grand jury transcript available during the evidentiary hearing and could have questioned the witness concerning her grand jury testimony at that time and has not offered any explanation for failing to do so, Hampton has not shown that the interests of justice require supplementing the record, and her motion, [Doc. 32], is hereby **DENIED**.

[3] See [Doc. 21] for a transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In addition, the parties submitted exhibits during the hearing, which will be referred to as "(Gov. Ex. ___)" for the government's exhibits and ("Def. Ex. ___") for Hampton's exhibits.

stealing mail, including gift cards issued by Kohl's Department Store, from the Douglasville post office. (Tr. at 11-12, 50-52, 62-64). The allegation was referred to OIG Special Agent Coral Williams ("Agent Williams") to investigate, and she spoke with the anonymous tipster and advised the tipster to contact her the next time the post office received the Kohl's mailers for delivery so that she could conduct surveillance to either substantiate or dispel the allegation. (Tr. at 11-12, 51-54, 56).[4]

On November 30, 2010, the tipster contacted Agent Williams and advised her that the post office had received the Kohl's mailers containing the gift cards that day for delivery. (Tr. at 12-13, 53-54). Therefore, Agent Williams, along with OIG Special Agents Ray White ("Agent White"), Dominick Delmastro ("Agent Delmastro"), and Judith Luther ("Agent Luther"), met at the Douglasville post office and set up surveillance that afternoon. (Tr. at 13, 54-55, 57). Specifically, Agents Williams and White positioned themselves inside the post office building in a lookout gallery above the post office workroom floor where they could not be seen

---

[4] Agent Williams, who was aware of the tipster's actual identity, testified that she believed she had conducted a background check of the tipster that revealed that the tipster had a prior arrest though she could not recall any details about the arrest. (Tr. at 51-53).

while Agents Delmastro and Luther were stationed in their vehicles parked on the outside of the post office building.  (Tr. at 13-14, 55-56, 104, 116).[5]

Initially, Agents Williams and White observed Poole conducting her regular duties, but after all of the mail carriers had returned from delivering mail on their routes, they noticed a citywide carrier approach Poole with Kohl's gift cards that were banded together and place them on the table while he had a discussion with Poole.  (Tr. at 14-15).  Shortly thereafter, the citywide carrier picked up the banded gift cards, placed them back into his bin, walked back to his work station, and placed the bin on the floor with the rest of his Undeliverable Bulk Business Mail ("UBBM") items.[6]  (Tr. at 15).  After it appeared that most of the USPS employees had left for the day, Agents Williams and White observed Hampton and Poole rummaging through other USPS mail carriers' individual UBBM bins located at each of their work stations.  (Tr. at 15-16, 57, 60, 62; Def. Ex. 1).  In particular, the agents

---

[5] During the surveillance, Agents Williams and White maintained constant contact with Agents Delmastro and Luther and advised them of what they were observing on the inside from the lookout gallery.  (Tr. at 17-19, 104).

[6] UBBM is pre-sorted, standard third class mail that is undeliverable to the intended address for some reason.  (Tr. at 15, 59).  Generally, a business pays "for these mailings to go out one way through the post office" such that if the mail is undeliverable, it is returned to the post office and is recycled, for which the post office receives money.  (Tr. at 59-60).  Agent Williams testified that it was her understanding that the Douglasville post office would generally have a custodian empty each mail carrier's individual UBBM bin into a consolidated UBBM located in a large crab cage in the mail processing area to be recycled.  (Tr. at 16, 57-58, 61).

4

observed Hampton and Poole take some of the individual UBBM bins to the consolidated UBBM area where they began extracting mail from those bins and placing the mail in a priority mail box as they poured the items out of the individual bins into the consolidated UBBM bin. (Tr. at 15-17, 61).[7] The agents then observed Hampton and Poole exit the post office building through the back door to the loading dock area with the priority mail box filled with mail items that had been extracted from the individual UBBM bins. (Tr. at 16-18, 56).

At this time, Agents Luther and Delmastro, who were instructed by Agent Williams to make contact with Hampton and Poole, drove their vehicles from the customer parking lot in front of the post office around to the back loading dock area where Agent Luther observed Hampton already getting into the driver's seat of her vehicle without the box in her hand. (Tr. at 18, 64-65, 104-05, 112, 117-18).[8] Therefore, Agent Luther, who was casually dressed with her badge around her neck, positioned her vehicle behind Hampton's vehicle,[9] approached Hampton who was

_____

[7] Because the floor lights were turned off, the agents could not see the nature of the mail items that Hampton and Poole were placing into the priority mail box. (Tr. at 17, 61).

[8] Although it was evening and dark outside, the loading dock area was well-lit so that everything was still visible. (Tr. at 94, 112).

[9] Hampton and Poole were parked beside each other, but there may have been an empty parking space between their two vehicles. (Tr. at 37-38, 66-67, 110-11; Gov. Ex. 4; Def. Ex. 5). Agent Delmastro pulled his vehicle behind Poole's vehicle and he

seated in the driver's seat of her vehicle with her door still ajar, identified herself as a Special Agent with OIG, and then asked Hampton if she would go back inside the post office building and answer some questions. (Tr. at 106-07, 118, 121-22, 125). Hampton agreed and she and Poole accompanied Agents Luther and Delmastro inside the building, with either Hampton or Poole opening the door since it required an access code. (Tr. at 107, 113, 123-24).[10]

Once inside the post office building, Agent Luther advised Hampton and Poole that Agent Williams was the lead case agent and that she would be arriving momentarily and that they "weren't going to ask any questions or conduct any

---

initially made contact with her. (Tr. at 106, 111). With regard to Hampton, Agent Luther testified that though she may have parked behind Hampton's vehicle in a manner that may have blocked it from leaving, she believed that Hampton would have been able to maneuver her vehicle out of the parking lot if she wanted to leave and that Hampton could walk away even if she were not able to maneuver her vehicle out of the parking spot. (Tr. at 106, 111-12, 119, 124). Agent Williams testified that she believed that Agents Luther and Delmastro had parked so that Hampton and Poole's vehicles were blocked, but that she was not certain of her recollection, (Tr. at 67-68).

[10] Agent Luther testified that after she approached Hampton and they re-entered the post office building, Hampton was not arrested, placed in handcuffs, threatened or touched in any way, or made any promises; that she never displayed her weapon, which was inside of her fanny pack and not visible; and that she spoke to Hampton in a calm and courteous voice. (Tr. at 107-08, 113, 125-26). Agent Luther further testified that Hampton seemed to understand what was being said to her. (Tr. at 109). Moreover, neither agent informed Hampton or Poole of the purpose for the request to go back inside the post office building at that time. (Tr. at 107-08).

investigation until she arrived." (Tr. at 56, 113-14). While they awaited Agent Williams' arrival, neither Agent Luther nor Agent Delmastro told Hampton where to stand or sit, and Hampton was not handcuffed, restrained, threatened, or beaten in any way. (Tr. at 114). After no more than five minutes had passed, Agents Williams and White entered the post office building from the loading dock area. (Tr. at 68, 114).[11]

Prior to approaching Hampton, Agent Williams again exited the building and returned to her vehicle, which she had relocated from the front of the post office building to the loading dock area, in order to retrieve the standard forms used by OIG prior to conducting interviews. (Tr. at 19-20, 39, 67-68-69). While she was outside, Agent Williams looked inside Hampton's vehicle, which was a cream colored Navigator SUV, through the rear driver's side window and observed in plain view the priority mail box Hampton was seen leaving the post office with moments before on the backseat. (Tr. at 20-21, 70, 83-84, 95, 105; Def. Exs. 2 & 3).[12]

---

[11] Prior to entering the post office building, Agent Williams testified that she looked inside Poole's vehicle and observed in plain view various boxes that were sealed. (Tr. at 19). Poole had also been seen exiting the post office carrying boxes in her hands. (Id.).

[12] Agent Williams testified that even though it was evening and the back window of Hampton's vehicle was tinted, the lighting in the loading dock area allowed her to see that the priority box contained Kohl's gift card mailers. (Tr. at 21, 39, 45, 83, 96).

After Agent Williams returned inside of the post office building, she approached Hampton, identified herself, and advised her that she wanted to talk with her, at which time Hampton agreed to speak with the agents. (Tr. at 21, 76). Prior to the interview, however, Hampton asked Agent Williams if she could contact someone to make arrangements for the care of her daughter and, after receiving an affirmative response, Hampton was allowed to use her cell phone and was seen scrolling through her phone as well as overheard talking to someone who was believed to be her child. (Tr. at 21-22, 74-75, 79).[13]

After Hampton finished making arrangements for her daughter, Agent Williams verbally advised Hampton in the presence of Agent White that she was free to leave at any time and that the interview was voluntary by reading from a form entitled "Acknowledgement of Rights." (Tr. at 24-25, 27, 80-82, 100; Gov. Ex. 1). Specifically, Agent Williams advised Hampton that she had the right to remain silent if her answers could result in a criminal charge being brought against her; that

---

[13] Hampton also asked if she could use the bathroom and since Agent Williams also needed to use it, she went with Hampton to the restroom. (Tr. at 22, 79). At this time, Hampton was not restrained in any way and was not threatened with physical force or arrest and Agent Williams testified that she did not place her hands on Hampton. (Tr. at 22-23). Though Agent Williams was armed with a weapon, she testified that her weapon was never visible to Hampton at any time during the encounter and that she never made any promises to Hampton. (Tr. at 23, 76). When they were finished, Agent Williams and Hampton returned to a supervisor's room in which Hampton was allowed to sit by a desk aside Agents Williams and White. (Tr. at 23, 28-29, 73; Gov. Ex. 2).

any statements she made could be used as evidence in administrative proceedings, civil proceedings, or any future criminal proceedings involving her; that if she refused to answer the questions posed on the grounds that the answers may incriminate her, she could not be discharged solely for remaining silent; and that the interview was strictly voluntary and that she may leave at any time. (Tr. at 25-26; Gov. Ex. 1). Hampton placed her initials beside each of the rights on the form and then signed the form, acknowledging that she had read or had the rights read to her and that she understood her rights. (Tr. at 25-27; Gov. Ex. 1). In addition, Agent Williams signed the form and it was witnessed by Agent White. (Tr. at 27; Gov. Ex. 1).

Thereafter, Agent Williams explained to Hampton why the agents were there and proceeded to interview her. (Tr. at 29). Specifically, Agent Williams asked Hampton about the allegation regarding the Kohl's gift cards and advised her that they had just seen her "rummaging through the mail," to which Hampton replied, "Oh, I was not rummaging, I was looking at some of the mailings myself because I also heard the same allegations." (Tr. at 29-30). Agent Williams asked Hampton to show her what she meant so Hampton took her to the consolidated UBBM area and showed Agent Williams a couple of Kohl's mailers that were missing gift cards. (Tr. at 30, 77). Hampton then explained that she was looking at the mailers so that she

could see which routes were missing the cards because she also "believe[d] that they were being stolen."  (Tr. at 30).  Agent Williams asked Hampton whether she was planning to report the matter to OIG, but Hampton did not respond.  (Tr. at 77-78).

Subsequently, Agents Williams and White along with Hampton returned to the supervisor's room at which time Agent Williams asked Hampton if they could search her vehicle, and she replied in a calm manner by stating, "Sure."  (Tr. at 30, 32, 78, 82).  Agent Williams then presented Hampton with a Consent to Search form in which Hampton acknowledged with her signature that she had been informed of her constitutional right not to have a search made of her vehicle without a search warrant and that she had a right to refuse consent to such a search, but that she was authorizing the agents to conduct a complete search and to seize mail matter or other property in connection with mail theft from her vehicle.  (Tr. at 32, 34-35, 82; Gov. Ex. 3).[14]  Between the time the interview began and the time Hampton gave

---

[14] Up to this point in the encounter, Agent Williams had spoken to Hampton in a calm voice and Hampton appeared to understand everything she had said to her. (Tr. at 23-24, 27). Moreover, Hampton did not appear to be under the influence of any drugs or alcohol, and she never complained about any ailment or other medical condition.  (Tr. at 27, 109).  Indeed, Hampton even acknowledged in  the Consent to Search form that "[t]his written permission is being given by me to the agents voluntarily and without threats or promises of any kind."  (Gov. Ex. 3). Additionally, at the time Hampton consented to the interview and the search of her vehicle, she was not under arrest, had not been restrained in any way, handcuffed, beaten, or promised anything in return for her consent and no weapons had been displayed to her.  (Tr. at 29, 34-35, 78-79).

consent to search her vehicle, approximately fifteen to twenty minutes had passed. (Tr. at 32).

After Hampton signed the Consent to Search form, Agents Williams and White, accompanied by Hampton, went outside to search Hampton's vehicle, but when Agent Williams began the search, she immediately noticed that the priority mail box containing the Kohl's mailers that she had previously observed on the backseat was no longer in the vehicle. (Tr. at 35-36, 82, 84-85, 98). Agent Williams asked Hampton what happened to the box, and Hampton initially denied knowing what she was talking about. (Tr. at 36, 98). Agent Williams became very displeased and asked Hampton whether she thought she was stupid and stated, "You know, you don't want to play this game. You know you are obstructing justice and whoever you had come out here, you know, to take the box, they are doing it as well." (Tr. at 36, 85-87, 98-99). Agent Williams further stated, "Well, you know, it is up to you. . . You can tell me who it is or I can receive a subpoena for your phone records." (Tr. at 36-37, 86). Hampton then admitted that she had asked Robin Salsbury ("Salsbury"), another USPS employee, to come and retrieve the box out of her vehicle before the interview began. (Tr. at 37, 39-42, 87, 97).

Agent Williams asked Hampton to contact Salsbury and instruct her to return the priority mail box to the post office. (Tr. at 40, 87-88).[15] While waiting for Salsbury to return, Hampton provided the agents with a written statement as follows:

> Today I was confronted by inspectors for taking Kohls coupons. I involved [Salsbury] by asking . . . through a text to remove the box from my vehicle. She did so not knowing what it entailed. I take sole responsibility in this matter. Had she known the full details I am positive she would not have done as I requested. I apologize for involving her and would like no further actions taken against her.

(Tr. at 41, 45-47, 88; Gov. Ex. 7). Hampton acknowledged that she made the decision to make this statement "freely, knowingly, and voluntarily, and without any threats or promises having been extended . . . ." (Tr. at 47-48; Gov. Ex. 7). In addition, when Hampton provided this written statement, she was not under arrest and she had not been threatened, restrained, handcuffed, or beaten. (Tr. at 45-46, 98-99, 115-16). No promises had been made to Hampton and no agent had displayed their weapon to her. (Tr. at 46, 76, 99-100).

After approximately fifteen to thirty minutes had passed, the agents contacted Salsbury who advised them that she had returned the priority mail box containing

---

[15] Agent Williams testified that Hampton contacted Salsbury and said, "Oh, I'm in trouble, you need to bring the box back." (Tr. at 40, 87). Hampton had not been placed under arrest at this time, had not been threatened with arrest, and was not restrained in any way. (Tr. at 40-41).

the Kohl's mailers to the backseat of Hampton's vehicle at which time the agents immediately retrieved the box and seized it. (Tr. at 42-43, 89-90).[16] Hampton reviewed the priority mail box and its contents, which contained approximately 133 Kohl's gift cards, and then placed her initials on it and some of its contents to acknowledge that it was the same box she had taken from the post office.[17] (Tr. at 43-44, 91, 100-01; Gov. Exs. 5 & 6). At this time, Hampton had still not been restrained in any way and had not been threatened with arrest. (Tr. at 101). During the encounter, Hampton never requested that the agents cease interviewing her and she never objected to the search of her vehicle or sought to limit or rescind her consent in any way. (Tr. at 46, 99). At the conclusion of the investigation, Agent Williams gave Hampton a citation regarding the allegation of mail theft and advised her that she would be notified of when to appear in court. (Tr. at 49). Hampton was then allowed to leave the premises. (Id.).[18]

---

[16] Initially, Salsbury had simply returned the box to Hampton's vehicle and left, but Agent White contacted Salsbury and informed her that they needed to speak with her and asked her to return to the post office. (Tr. at 89-90). Once Salsbury returned, the agents were able to view text messages on her phone from Hampton showing that Hampton had asked Salsbury to come to the post office and retrieve the priority mail box from her vehicle. (Tr. at 97-98).

[17] None of the mail contained in the priority mail box was addressed to Hampton. (Tr. at 44).

[18] On December 30, 2010, Linda Calloway ("Calloway"), a USPS supervisor at the Douglasville post office, interviewed Hampton. (Tr. at 30, 62, 92, 101). OIG

## II. DISCUSSION

Hampton seeks to suppress evidence and statements because she contends they were the product of an unlawful seizure and detention in violation of her Fourth Amendment rights. [Doc. 31 at 11-21]. Hampton also seeks to suppress any statements made following the initial search of her vehicle as violative of her Miranda[19] rights and involuntary. [Id. at 22-32]. Hampton further moves to suppress any statements made to Calloway on December 30, 2010, for insufficient evidence of voluntariness. [Id. at 32-35]. Finally, Hampton asserts that the evidence seized from the search of her vehicle should be suppressed as the fruit of her illegal detention and based on an invalid consent. [Id. at 21, 35-36].

The government argues that the initial encounter with Hampton was consensual but even if not, that the agents had reasonable suspicion to conduct a Terry[20] stop that did not become a *de facto* arrest. [Docs. 25 & 34]. Additionally, the government contends that Hampton's statements were not the product of a

_____

agents were not involved in this interview in any way and Agent Williams even testified that she was unaware of any interview that took place between Calloway and Hampton. (Tr. at 31-32, 101). In fact, Calloway was not directed to conduct this interview by any law enforcement personnel and no one affiliated with OIG participated in the interview. (Tr. at 31, 101).

[19] See Miranda v. Arizona, 384 U.S. 436 (1966).

[20] Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968).

custodial interrogation, but were freely and voluntarily rendered. [Doc. 25 at 12-27]. The government also argues that any statements made to Calloway were not made as a result of police coercion and are therefore not due to be suppressed. [Doc. 34 at 20-21]. Finally, the government asserts that Hampton's vehicle was lawfully searched pursuant to Hampton's valid consent as well as the automobile exception to the search warrant requirement. [Doc. 25 at 28-32]. The Court will address the merits of each of these arguments.

## A.    The Initial Encounter

### 1.    *Applicable Law*

"The Fourth Amendment of the United States Constitution guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" United States v. Adigun, Criminal Case No. 1:10–cr–00202–RWS–RGV, 2011 WL 2194253, at *15 (N.D. Ga. May 4, 2011), adopted by 2011 WL 2198308, at *1 (N.D. Ga. June 3, 2011) (alteration in original) (quoting U.S. Const. amend. IV). "The Supreme Court has identified three distinct types of police-citizen encounters, each requiring a different level of suspicion to be deemed reasonable under the Fourth Amendment: '(1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which

require no objective justification.'" <u>United States v. Brown</u>, 401 F.3d 588, 592 (4th Cir. 2005) (<u>quoting</u> <u>United States v. Weaver</u>, 282 F.3d 302, 309 (4th Cir. 2002) (citations omitted)); <u>see also</u> <u>United States v. Jordan</u>, 635 F.3d 1181, 1185 (11th Cir. 2011); <u>United States v. Hastamorir</u>, 881 F.2d 1551, 1556 (11th Cir. 1989); <u>United States v. Puglisi</u>, 723 F.2d 779, 783 (11th Cir. 1984); <u>United States v. Hunter</u>, No. 1:07-CR-310-1-TWT, 2008 WL 552881, at *3 (N.D. Ga. Feb. 25, 2008), adopted at *1.

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place . . . ." <u>Florida v. Bostick</u>, 501 U.S. 429, 434 (1991) (<u>quoting</u> <u>Florida v. Royer</u>, 460 U.S. 491, 497 (1983)); <u>see also</u> <u>United States v. Mendenhall</u>, 446 U.S. 544, 553-54 (1980) (citation omitted) (stating that there is nothing in the Constitution which prevents a police officer from addressing questions to anyone on the streets); <u>Miller v. Harget</u>, 458 F.3d 1251, 1257 (11th Cir. 2006) (citations omitted) ("This Court has decided on several occasions that a police officer does not seize an individual merely by approaching a person in a parked car."). In <u>Bostick</u>, the Supreme Court held that:

> [A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business," the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.

501 U.S. at 434 (internal citation omitted) (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)). Even if the agents have no basis for suspecting a particular individual, "they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her [property] – as long as the police do not convey a message that compliance with their requests is required." Id. at 434-35 (internal citations omitted); see also United States v. Graham, No. 2:06-cr-144-WKW, 2007 WL 2746656, at *3 (M.D. Ala. Sept. 19, 2007), adopted at *1 (collecting cases). An individual's Fourth Amendment right is implicated when she is no longer "free to leave." Michigan v. Chesternut, 486 U.S. 567, 573 (1988) (internal marks and citation omitted); see also United States v. Mitchell, 407 F. App'x 407, 409 (11th Cir. 2011) (per curiam) (unpublished). "[T]o determine whether a particular encounter constitutes a seizure, a court must consider all of the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Bostick, 501 U.S. at 439; see also United States v. Hunter, 373 F. App'x 973, 976 (11th Cir. 2010) (per curiam) (unpublished).

A seizure arises "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. . . ." Terry, 392 U.S.

at 19 n.16; see also Miller, 458 F.3d at 1257; United States v. Lowe, No. CR 311–001, 2011 WL 2600513, at *4 (S.D. Ga. June 16, 2011), adopted by 2011 WL 2710393, at *1 (S.D. Ga. July 12, 2011).  "Some factors which 'might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'"  Hunter, 2008 WL 552881, at *3 (quoting Mendenhall, 446 U.S. at 554); see also United States v. Edwards, No. 1:05-cr-0097-WSD-JFK, 2007 WL 2479288, at *3 (N.D. Ga. Aug. 28, 2007).  Other factors courts have considered include prolonged retention of a person's personal effects, a request to accompany the agent to the station, and whether the encounter occurred in a nonpublic place or in a small, enclosed space.  United States v. Laboy, 979 F.2d 795, 799 (10th Cir. 1992) (collecting cases).  That an agent does not specifically advise the person of her right to walk away does not elevate the encounter into a seizure absent some other evidence of coercion or restricted freedom.  United States v. Hathcock, 103 F.3d 715, 719 (8th Cir. 1997).  Additionally, an agent's unexpressed intent to detain the individual had she attempted to leave is irrelevant under the objective standard utilized in determining whether a Fourth Amendment seizure has occurred.  United States v. Archer, 840 F.2d 567, 572 (8th Cir. 1988) (citing

Mendenhall, 446 U.S. at 554 n.6); see also Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011).

Therefore, "[t]he key inquiry is whether, under the totality of the circumstances, 'the police conduct would have communicated to a reasonable person that [s]he was not at liberty to ignore the police presence and go about [her] business.'" Edwards, 2007 WL 2479288, at *3 (quoting United States v. Baker, 290 F.3d 1276, 1278 (11th Cir. 2002)). "'That is, where a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter, the encounter with the police is consensual, and the Fourth Amendment is not implicated.'" Id. (quoting United States v. Ramirez, 476 F.3d 1231, 1238 (11th Cir. 2007)). Thus, a consensual encounter becomes a Terry stop if the defendant's cooperation "is induced by 'coercive means' or if a reasonable person would not 'feel free to terminate the encounter. . . .'" United States v. Wright, No. 3:06cr447/MCR, 2006 WL 3483503, at *2 (N.D. Fla. Nov. 30, 2006) (citation omitted) (quoting United States v. Perez, 443 F.3d 772, 777-78 (11th Cir. 2006)).

An investigative stop of an individual by law enforcement, as opposed to a police-citizen encounter, triggers Fourth Amendment scrutiny. Hunter, 373 F. App'x at 976. An officer may briefly detain a person for an investigative Terry stop only when there exists "reasonable suspicion," based on articulable facts, that "criminal

activity may be afoot." Terry, 392 U.S. at 30; United States v. Sokolow, 490 U.S. 1, 7 (1989) (citation omitted); Hunter, 373 F. App'x at 976. Officers need not have probable cause. Sokolow, 490 U.S. at 7 (citation omitted) ("[T]he level of suspicion required for a Terry stop is obviously less demanding than that for probable cause."); see also United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1220 (11th Cir. 1993).

When evaluating the propriety of an investigative stop, the Court must determine whether reasonable suspicion existed in view of the totality of the circumstances. United States v. Arvizu, 534 U.S. 266, 273-74 (2002); United States v. Caraballo, 595 F.3d 1214, 1222 (11th Cir. 2010). Although "the concept of reasonable suspicion is somewhat abstract," courts "have deliberately avoided reducing it to 'a neat set of legal rules.'" Arvizu, 534 U.S. at 274 (quoting Ornelas v. United States, 517 U.S. 690, 695-96 (1996)). The agent must articulate some minimal, objective justification for an investigatory stop based on the totality of the circumstances and the collective knowledge of the agents involved in the encounter. Sokolow, 490 U.S. at 7-8; United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989); United States v. Cotton, 721 F.2d 350, 352 (11th Cir. 1983); United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1334-35 (N.D. Ga. 2009), adopted at 1326. A reasonable suspicion determination must be based on common sense judgments and inferences

about human behavior. <u>Illinois v. Wardlow</u>, 528 U.S. 119, 125 (2000); <u>United States v. Cortez</u>, 449 U.S. 411, 418 (1981); <u>United States v. Reed</u>, 402 F. App'x 413, 415 (11th Cir. 2010) (per curiam) (unpublished). While the reasonable suspicion standard is not onerous, an agent's reliance on a "mere hunch" is not sufficient to establish reasonable suspicion. <u>Arvizu</u>, 534 U.S. at 274 (citation omitted); <u>see also</u> <u>United States v. Lopez-Garcia</u>, 565 F.3d 1306, 1313 (11th Cir. 2009). Mindful of these principles, the Court turns to the totality of the circumstances confronting the agents when they encountered Hampton on November 30, 2010, and the reasonable inferences to be drawn therefrom.

### 2.    *Analysis*

The first issue to be decided is whether the initial encounter between Agent Luther and Hampton in the post office parking lot implicated the Fourth Amendment. <u>See</u> <u>Fedanzo v. Vroustouris</u>, No. 00 C 4937, 2001 WL 1242841, at *5 (N.D. Ill. Oct. 17, 2001) ("We will address the 'seizure' argument first because the constitutional protections of the Fourth Amendment do not even come into play unless there has been a seizure."). Hampton argues that the agents did not have a reasonable, articulable suspicion that she was involved in any criminal activity to warrant her stop and subsequent detention, and therefore the evidence seized and statements obtained by the agents should be suppressed. [Doc. 31 at 15-21]. The

government contends that the initial encounter with Hampton was consensual and did not implicate the Fourth Amendment. [Doc. 34 at 2-15]. Alternatively, the government contends that even if the initial encounter was not consensual, the agents had a reasonable, articulable suspicion to approach and detain Hampton, which quickly ripened into probable cause to arrest. [Id. at 15-18]. The Court finds that Agent Luther's initial contact with Hampton was a lawful consensual encounter, and in any event, the facts known to the agents and the circumstances that occurred prior to the encounter provided the agents with reasonable suspicion to briefly detain Hampton.

Agents Luther and Delmastro initiated contact with Hampton and Poole after receiving information from Agent Williams during the course of their surveillance, which occurred after they had already received an allegation from a tipster regarding the theft of mail by Hampton, that Hampton and Poole were just observed extracting mail from individual mail carrier's UBBM bins and placing it in a priority mail box and then exiting the post office building with the box in hand. (Tr. at 11-13, 15-18, 50-56, 61-62, 64-65, 104-05, 112, 117-18). Agents Luther and Delmastro, who were seated in their vehicles in the front of the post office, immediately pulled around back to the loading dock area where Hampton and Poole were parked, and Agent Luther observed Hampton already getting into the driver's seat of her vehicle

without the box in her hands. (Tr. at 18, 64-65, 104-05, 112, 117-18). Therefore, Agent Luther parked her vehicle behind Hampton's vehicle, approached Hampton who was seated in the driver's seat of her vehicle with her car door still ajar, identified herself as a Special Agent with OIG, and then asked if Hampton would accompany her inside of the post office building to answer some questions. (Tr. at 106-07, 118, 121-22, 125). Hampton agreed and she and Poole, who had been speaking with Agent Delmastro, accompanied the agents back inside the post office building. (Tr. at 107, 113, 123-24).

"'[A]n officer's approach of a car parked in a public place does not constitute an investigatory stop or higher echelon Fourth Amendment seizure.'"[21] United

---

[21] While Hampton argues that she was unlawfully seized because she was parked in a "private lot behind the post office, which is reserved for official vehicles of the postal service and employees of the postal service" as opposed to the public lot, [Doc. 31 at 15], the evidence is to the contrary. In fact, while Hampton was parked behind the post office near the loading dock area, the testimony presented at the evidentiary hearing demonstrates that the parking lot was not fenced off or under any kind of controlled access as the agents were readily able to move their vehicles from the front of the post office building to the back without delay. (Tr. at 105; Def. Exs. 5 & 6). Indeed, courts have held that there is no reasonable expectation of privacy where there is no evidence that the parking lot was fenced or otherwise limited to the public. See United States v. Gooch, 499 F.3d 596, 603 (6th Cir. 2007) (finding that defendant who paid to park in VIP area of parking lot did not have expectation of privacy where "nothing at all prohibited others, including police officers, from walking through this so-called 'restricted area'"); Hill v. Sharber, 544 F. Supp. 2d 670, 679 (M.D. Tenn. 2008) (finding search of individual's car lawful even though it was conducted in a parking lot on school property that required a parking pass to park); United States v. Hargrove, 855 F.2d 887, 1988 WL 90763, at *1 (D.C. Cir. 1988) (per curiam) (unpublished) ("Whatever privacy

States v. Moulton, Criminal Case No. 1:10-CR-00120-MHS-RGV, 2010 WL 6084115, at *5 (N.D. Ga. Nov. 22, 2010), adopted by 2011 WL 902639, at *1 (N.D. Ga. Mar. 14, 2011) (alteration in original) (citations and internal marks omitted) (quoting United States v. Ingram, 151 F. App'x 597, 599 (9th Cir. 2005) (unpublished) (Reavley, J., dissenting)); see also United States v. Graham, 323 F. App'x 793, 798 (11th Cir. 2009) (per curiam) (unpublished).  "Therefore, the mere act of approaching [Hampton] in [her] parked car was permissible, regardless of whether the officers had reasonable suspicion of criminal activity, Graham, 323 F. App'x at 798 (citing Baker, 290 F.3d at 1279), "and here, the [agents] did nothing to indicate that [Hampton] was being seized or detained when they first approached [her]," Moulton, 2010 WL 6084115, at *5.

Specifically, the evidence shows that Agent Luther never drew her weapon, which was not even visible to Hampton, and that she spoke to Hampton in a calm and courteous tone.  (Tr. at 107-08, 113, 125-26).  There is no evidence that Agent Luther applied any force or threatened Hampton in any way to compel Hampton to speak with her or to agree to go inside the post office building.  In fact, the evidence is to the contrary.  See (id.).  Moreover, while the parties dispute whether

expectations might ordinarily be associated with property interests in the parking area were dissipated by the openness of the area . . . and the absence of measures to restrict entry."); see also United States v. Reed, 733 F.2d 492, 501 (8th Cir. 1984).

Agent Luther blocked Hampton's vehicle when she pulled in behind her, <u>see</u> (Tr. at 67-68, 106, 111-12, 119, 124), even if the Court finds that it was effectively blocked, "the fact that the officers [] blocked the vehicle [Hampton] was in with their patrol car[] does not transform the consensual encounter into a seizure under the Fourth Amendment," <u>Moulton</u>, 2010 WL 6084115, at *5 (<u>citing</u> <u>United States v. Kim</u>, 25 F.3d 1426, 1428, 1430-31 (9th Cir. 1994) ("finding that an officer's initial encounter with defendant, who was seated in his lawfully parked car, was not a seizure where the officer parked his car partially blocking defendant's car, approached defendant's car on foot, and asked for, and received permission to question the defendant")); <u>see also</u> <u>Am. Fed'n of Labor & Congress of Indus. Orgs. v. City of Miami, Fla.</u>, 637 F.3d 1178, 1191 (11th Cir. 2011) (citation and internal marks omitted) ("A seizure occurs whenever the police restrain the freedom of a person to walk away."); <u>United States v. Thompson</u>, 546 F.3d 1223, 1228-29 (10th Cir. 2008) (finding defendant's encounter with officer consensual even though his vehicle may have been partially blocked in the parking spot); <u>United States v. Summers</u>, 268 F.3d 683, 687 (9th Cir. 2001) (finding interaction with defendant was consensual even where officer partially blocked defendant's vehicle stating, "[The defendant's] car was parked and was only partially blocked. Nothing prevented him from leaving the scene on foot."). <u>But see</u> <u>United States v. Jones</u>, 562 F.3d 768, 772-73 (6th Cir. 2009) (finding a seizure

because a reasonable person would not feel free to leave once officers had blocked his vehicle). Thus, although Agent Luther's vehicle may have been parked in a manner that prevented Hampton's vehicle from leaving, Agent Luther's initial approach and request to accompany her inside the post office building was a consensual encounter, see United States v. Drayton, 536 U.S. 199, 200 (2002); Bostick, 501 U.S. at 434 ("[S]eizure does not occur simply because a police officer approaches an individual and asks a few questions."); United States v. Foster, 376 F.3d 577, 581-84 (6th Cir. 2004) (finding no seizure where three uniformed officers approached defendant as he was emerging from a parked car with the engine running and asked him his name, what he was doing, and whether he had identification), but even if the encounter amounted to a Terry stop, the agents had reasonable suspicion for their actions based on the information provided by the tipster and the events agents observed inside the post office that day.

Once the agents and Hampton and Poole entered the post office building, Agent Luther advised Hampton and Poole that Agent Williams was the lead case agent and that she would be arriving momentarily and that neither she nor Agent Delmastro were going to ask any questions until Agent Williams arrived. (Tr. at 56, 113-14). Despite Hampton's argument that she and Poole "sat essentially under the guard of Luther and Delmastro" and that Hampton was not "allowed freedom of

movement in the post office," [Doc. 31 at 17], the evidence shows that neither Agent Luther nor Agent Delmastro told Hampton where to stand or sit or restricted or retrained their movement in any way, (Tr. at 114).[22]  Furthermore, after Agent Williams returned to the post office building, she identified herself to Hampton and advised her that she wanted to talk to her at which time Hampton agreed to speak with the agents.  (Tr. at 21, 76).  Prior to the interview, however, Agent Williams allowed Hampton to use her cell phone to make arrangements for the care of her daughter and allowed her to use the bathroom, (Tr. at 21-22, 74-75, 79), which belies Hampton's assertion that her freedom of movement was curtailed, [Doc. 31 at 17].

Shortly thereafter, Agent Williams advised Hampton that she was free to leave at any time and that the interview was completely voluntary by reading from an "Acknowledgement of Rights" form.  (Tr. at 24-26, 27, 80-82, 100; Gov. Ex. 1). Hampton placed her initials beside each of the rights on the form and then signed the form, acknowledging that she had read the rights or had the rights read to her and that she understood them.  (Tr. at 25-27; Gov. Ex. 1).  Although Hampton argues that "prior to that point, the circumstances of the encounter were such that no

---

[22] While there was some discrepancy in the testimony as to when Hampton actually entered the supervisor's office, see (Tr. at 19-20, 124), the testimony was clear that no agent ever threatened Hampton, restricted her movement, or applied any force to compel her to sit inside the supervisor's office and that the agents were certainly not "guarding" Hampton has she posits, (Tr. at 114).

reasonable person in [Hampton's] shoes would have felt she was free to ignore the police and go about her business," [Doc. 31 at 18], as previously stated, the evidence shows that there was not a large presence of law enforcement agents as only Agent Luther initially approached Hampton with Agents Delmastro, Luther, and White joining thereafter, no weapons were ever displayed to Hampton or even visible for that matter, there were no threats or promises made to Hampton, she was not placed in handcuffs or restrained in any way, she was not placed under arrest, and there was no questioning by any of the agents prior to Hampton being advised that her interview was voluntary and that she was free to leave at any time, (Tr. at 23, 29, 76, 107-08, 113-14, 125-26). In fact, Hampton had not even been informed for the purpose of the agents' request to speak with her until after she was told she was free to leave at any time and therefore, she had not even been informed of any alleged wrongdoing or advised of any possible intention to detain or arrest her. (Tr. at 107-08). In short, the facts of this case do not support Hampton's arguments that she had been seized and was in custody prior to being advised that she was free to leave and that any interview was voluntary.[23] See United States v. Leese, 176 F.3d 740, (3d

---

[23] Hampton argues that because she was in custody at the time Agent Williams looked into her vehicle and observed the priority mail box on the backseat, that Agent Williams' "observations and the evidence derived therefrom is inadmissible fruit of the poisonous tree." [Doc. 31 at 18-19]. However, having found that Hampton was not in custody at this time, her argument in this regard is without merit.

Cir. 1999) (finding defendant was not in custody at the time she gave her statement in the postmaster's office where defendant was told she was not under arrest prior to any questioning began and the record did not show that her will was "overcome by coercive tactics of the postal inspectors"); United States v. Meiner, No. CR 05-1019, 2005 WL 1868897, at *3 (N.D. Iowa July 21, 2005), adopted by 381 F. Supp. 2d 1058, 1063 (N.D. Iowa 2005) (finding defendant was not in custody where postal inspector clearly informed him that he was not under arrest, he was never physically restrained, the postal inspector never took possession of his cell phone or prevented him from contacting anyone, and though his vehicle was blocked, he was never placed in handcuffs or told that he could not leave the premises of the post office); see also United States v. Gomes, 279 F. App'x 861, 869 (11th Cir. 2008) (per curiam) (unpublished) (finding defendant who was interviewed outside of a locked fence, was not physically retrained in any way, and was not told that he was under arrest, was not in custody even though officer told him that he would contact a probation officer who defendant feared would have him arrested); United States v. Opoku, 210 F. App'x 848, 851-52 (11th Cir. 2006) (per curiam) (unpublished) (finding that defendant who freely moved about his residence though under the agents' supervision was not in custody where agents did not handcuff him, brandish weapons, or make any promises or threats); United States v. Jones, Criminal Case

No. 1:11–CR–42–TCB–LTW, 2011 WL 4056074, at *3 (N.D. Ga. Aug. 23, 2011), adopted by 2011 WL 4026777, at *1 (N.D. Ga. Sept. 12, 2011) (finding defendant was not seized or in custody where he was not formally placed under arrest, the agents did not touch him, physically restrain him, restrict his movement, or otherwise compel him to make a statement).

In addition, Hampton argues that "[a]t a minimum, the seizure rose to the level of a <u>Terry</u> investigative stop if not an arrest," and that the agents lacked any reasonable, articulable suspicion to justify such a stop. [Doc. 31 at 19-21].[24] Specifically, Hampton contends that there was insufficient "indicia of reliability or veracity for the tip alone to establish reasonable, articulable suspicion." [<u>Id.</u> at 19 (citations omitted)]. Hampton's argument, however, ignores the fact that the agents corroborated the tipster's allegation by their own surveillance, which led to the observation of Hampton and Poole extracting mail from other mail carriers' UBBM bins and attempting to leave the premises with this mail. Thus, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." <u>United States v. Martin</u>, 297 F.3d 1308, 1314 (11th Cir. 2002) (alteration in original) (citation and internal marks omitted).

---

[24] Having already found that Hampton was not seized for Fourth Amendment purposes, this argument lacks merit. Nevertheless, since the parties have briefed this alternative argument, the Court will address its merits.

In fact, by the time Agent Williams sought consent to search Hampton's vehicle, which was approximately fifteen to twenty minutes after the interview began, the following circumstances provided her a particularized basis for reasonable suspicion: (1) the tip from the USPS employee that Hampton and another employee were stealing Kohl's gift card mailers from the post office; (2) observations of Hampton and Poole extracting mail from UBBM bins and exiting the post office with the mail in a priority mail box; (3) and observations of a priority mail box containing Kohl's gift cards in the backseat of Hampton's vehicle. (Tr. at 11-12, 15-18, 20-21, 32, 56, 61). "Viewed through the lens of an experienced [agent], these circumstances added up to a reasonable suspicion that [Hampton was] involved in criminal activity." <u>United States v. Espinal</u>, Criminal Case No. 1:11–cr–00060–ODE–RGV, 2011 WL 7004195, at *8 (N.D. Ga. Aug. 29, 2011), adopted by 2012 WL 92451, at *3 (N.D. Ga. Jan. 10, 2012) (citation and internal marks omitted).

Hampton argues that the agents lacked reasonable suspicion that she was involved in criminal activity because "[c]onviction for a postal theft offense would require a showing that [she] had either stolen or embezzled mail or mail matter," but "[t]he items that [she] was seen taking had reached its end point in the mail stream, had a status akin to abandoned property and essentially no longer belonged to

anyone any more" and "had essentially lost its character as mail." [Doc. 31 at 20-21].

However, the mere fact that the mail Hampton was seen taking was undeliverable does not mean it no longer constitutes "mail matter" under 18 U.S.C. § 1709. See United States v. Akinsuroju, 166 F. App'x 748, 750 (5th Cir. 2006) (per curiam) (unpublished) (affirming conviction for embezzlement of mail where defendant, a postal carrier, was observed taking mail from his postal vehicle and placing it inside the trunk of his personal vehicle, admitted that he had stolen mail from the UBBM bin, and the mail found in the trunk was properly post-marked, was intended to be conveyed by mail, and was entrusted to defendant for delivery). Indeed, § 1709 "applies broadly to the embezzlement of any item intended to be conveyed by mail; it makes no exception for valueless and undeliverable items slated for destruction." United States v. Grant, 494 F.2d 120, 123 (2d Cir. 1974). Therefore, the Court rejects this argument and finds it to be without merit. In sum, the totality of the circumstances provided the OIG agents with reasonable suspicion to lawfully detain Hampton for further investigation and the fruits of this detention are therefore not due to be suppressed.

B. **Hampton's Statements**

1. *Statements made to Agent Williams on November 30, 2010*

a. <u>Custodial Interrogation</u>

"*Miranda* warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." <u>United States v. Adams</u>, 1 F.3d 1566, 1575 (11th Cir. 1993) (citation and internal marks omitted); <u>see also</u> <u>Miranda</u>, 384 U.S. at 436; <u>United States v. Perdue</u>, 8 F.3d 1455, 1463 (10th Cir. 1993) ("[T]wo requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'"). "Custody" for purposes of triggering <u>Miranda</u> advisements occurs when "there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[25] <u>United States v. Brown</u>,

_____

[25] Although Hampton argues that she was in custody for purposes of <u>Miranda</u> because she was "seized" and a reasonable person in her situation would not have felt free to leave, <u>see</u> [Doc. 31 at 22-30], the "Supreme Court recently clarified 'that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody,'" <u>United States v. Parker</u>, Criminal Case No. 1:10-CR-1076-JEC-JFK, 2010 WL 5313758, at *8 (N.D. Ga. Nov. 18, 2010), adopted by 2010 WL 5313449, at *1 (N.D. Ga. Dec. 17, 2010) (quoting <u>Maryland v. Shatzer</u>, 130 S.Ct. 1213, 1224 (2010)). In other words, "a 'free-to-leave inquiry reveals *only* whether the person in question was seized.' While 'seizure is a necessary prerequisite to *Miranda*, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest.*'" <u>United States v. Luca-Encinas</u>, 603 F.3d 876, 881 (11th Cir. 2010) (alterations in original) (citations omitted). Thus, "the standards are different," and a person is in custody for <u>Miranda</u> purposes only where there is a "restraint on

33

441 F.3d 1330, 1347 (11th Cir. 2006) (citation and internal marks omitted) (quoting

California v. Beheler, 463 U.S. 1121, 1125 (1983)).  This determination is made

considering the totality of the circumstances, and factors relevant to this

determination include but are not limited to "the location of the interview, the

existence of any physical restraints such as handcuffs or drawn weapons, whether

the suspect asked to leave, the officers' demeanor, the degree of pressure applied to

the suspect, and whether the officers brandished weapons, touched the suspect or

used language or a tone that indicate that compliance with the officers could be

compelled."  United States v. Martinez-Leal, Criminal Action No. 1: 11-CR-19-TCB-

CCH, 2011 WL 3328907, at *15 (N.D. Ga. July 6, 2011), adopted by 2011 WL 3328682,

at *3 (N.D. Ga. Aug. 2, 2011) (citations and internal marks omitted).  The standard

is objective in that the actual subjective beliefs of the agents involved and Hamilton

are irrelevant: custody exists only if a reasonable person under the same set of

circumstances would feel "that [her] freedom of movement had been restrained to

the degree associated with a formal arrest."  Id.[26]  Hampton bears the burden of

---

freedom of movement to the degree associated with a formal arrest."  United States
v. Street, 472 F.3d 1298, 1310 (11th Cir. 2006); see also United States v. Cavazos, No.
11–50094, 2012 WL 149331, at *2 (5th Cir. Jan. 19, 2012) (citations omitted) ("Custody
for *Miranda* purposes requires a greater restraint on freedom than seizure under the
Fourth Amendment.").

[26] "[T]he reasonable person from whose perspective 'custody' is defined is a
reasonable innocent person."  Street, 472 F.3d at 1309 (quoting United States v.

establishing that she was in custody and that her statements were made in response to government questioning.  See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977).[27]

Hampton's motion to suppress statements, [Doc. 9], is due to be denied because she has not shown that the statements were made under circumstances that were tantamount to an arrest, and she therefore was not in custody for the purposes of Miranda.  See Brown, 441 F.3d at 1347.  During her encounter with the agents, Hampton was unrestrained in a familiar environment; was never advised that she was under arrest, but was told that she was free to leave at any time and that her interview was voluntary; and her freedom of movement was not restrained as evidenced by the fact that she was allowed to use her cell phone, use the restroom, and sit unrestrained beside the agents during the interview.  (Tr. at 21-25, 27-29, 73-76, 79-82, 100, 107-08, 113, 125-26; Gov. Ex. 1).  None of the agents made physical contact with Hampton, drew their weapons, or made any show of force or display of authority beyond identifying themselves as OIG agents.  (Tr. at 22-23, 28-29, 73, 76, 107-09, 113, 125-26).  Although Agent Luther's vehicle may have been parked so

Moya, 74 F.3d 1117, 1119 (11th Cir. 1996)).

[27] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

that it prevented Hampton's vehicle from leaving the parking lot, Hampton never asked Agent Luther to move her vehicle or asked if she could leave the scene. (Tr. at 46, 99, 106, 111-12, 119, 124). The circumstances under which Hampton spoke with Agent Williams fall far short of the degree of restraint necessary to trigger <u>Miranda</u> advisements. <u>United States v. Gaddie</u>, Criminal Action No. 3:07CR-111-JHM, 2008 WL 1995081, at *2 (W.D. Ky. May 6, 2008) (finding <u>Miranda</u> warnings were not required where OIG agents investigating the theft of gift cards confronted postal employee at employee's place of employment and employee, after consenting to the interview, was advised that he could terminate the interview, which lasted a little more than an hour, at any time, and agents never displayed any use of force or brandished any weapons); <u>see also</u> <u>Luca-Encinas</u>, 603 F.3d at 881-82 (defendant not in custody for <u>Miranda</u> purposes when he was detained for approximately five minutes in a neutral outdoor location, no handcuffs were employed, no guns were drawn, and defendant did not ask to leave or tell the officers he did not want to comply with their requests); <u>United States v. Acosta</u>, 363 F.3d 1141, 1148-50 (11th Cir. 2004) (defendant not in custody for <u>Miranda</u> purposes where officers retained defendant's license to check his identity; took and retained defendant's keys during the stop; blocked defendant's vehicle with their patrol cars, which defendant did not ask them to move; and momentarily drew one or more weapons on defendant when he exited his car); <u>United States v. Zellner</u>, Criminal Indictment No. 1:09-CR-320-

TCB-GGB, 2011 WL 530718, at *7-8 (N.D. Ga. Jan. 14, 2011), adopted by <u>United States</u> <u>v. Chester</u>, Criminal Action File No. 1:09-cr-320-TCB-GGB, 2011 WL 529952, at *1 (N.D. Ga. Feb. 4, 2011) (defendants not in custody for <u>Miranda</u> purposes during a 30-45 minute encounter in a parking lot where there were multiple armed officers in "battle dress uniforms" with dogs, the officers blocked defendants' vehicle from exiting the parking lot, the officers drew but never pointed their guns at defendants, the defendants were never handcuffed, the officers did not raise their voices and engaged defendants in a conversational tone, and the officers only touched defendants to perform a brief pat down for weapons); <u>Parker</u>, 2010 WL 5313758, at *9-10 (defendant not in custody for <u>Miranda</u> purposes where he was detained in handcuffs in a parking lot as part of a drug investigation, the conversation with law enforcement happened within the first five minutes of his detention, the officer's firearm was holstered when he spoke to defendant, the officer used a "very laid back" tone of voice and did not yell or threaten defendant, and defendant was advised that he was only being detained). Indeed, "[n]othing suggests that a reasonable person in [Hampton's] position would not have felt free to terminate the interview at any time," and "[t]herefore, no *Miranda* warnings were required prior to [Hampton's] questioning by the [a]gents." <u>Gaddie</u>, 2008 WL 1995081, at *2 (citation and internal marks omitted).

Hampton makes no argument regarding the initial questioning by Agent Williams, but contends that she was "in custody following the initial search of her vehicle" and should have been given <u>Miranda</u> warnings. [Doc. 31 at 25]. In this regard, Hampton argues that "[w]hile she had previously been informed that her interview with law enforcement officers would be voluntary, the color of the encounter changed swiftly and dramatically after Agents Williams and White went to her vehicle expecting to find a box containing Kohl's coupons but instead found nothing." [<u>Id.</u>]. Specifically, Hampton asserts that once Agent Williams discovered that the priority mail box she had initially observed in plain view on the backseat of Hampton's vehicle had been removed from the vehicle and was no longer there, Agent Williams "quickly became highly upset and confronted [Hampton], accusing her and the person who removed the box of committing the offense of obstruction of justice" and "of having misled them earlier when [Hampton] claimed to be making child-care arrangements for her daughter." [<u>Id.</u>]. Hampton further asserts that Agent Williams' demeanor and accusations coupled with the fact that she was alone with Agents Williams and White in the back parking lot in the evening after the encounter had already lasted about thirty minutes "weighs in favor of a finding that [Hampton's] freedom of movement was curtailed to a degree associated with a formal arrest." [<u>Id.</u> at 25-27]. The Court finds this argument unpersuasive.

The mere fact that Agent Williams advised Hampton that the removal of the box was an obstruction of justice for which she could be charged did not transform the encounter into a custodial interrogation. In fact, as the Eight Circuit has stated:

> It is appropriate for an investigator to advise a suspect of the potential course and consequences of a criminal investigation. Suspects frequently confront difficult decisions about whether to defend against potential criminal charges or to pursue resolutions that may ameliorate certain unpleasant consequences. . . . But the presentation of information that requires such a decision does not tend to restrain a person's freedom of movement such that [she] should be deemed in custody. . . . [S]ome degree of coercion is part and parcel of the interrogation process and [] the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting . . . her freedom to depart.

United States v. Czichray, 378 F.3d 822, 829 (8th Cir. 2004) (fifth alteration in original) (citation and internal marks omitted). A reasonable person would not have understood Agent Williams' remarks to have restricted his or her ability to terminate the questioning. See Leese, 176 F.3d at 744 (finding postal employee was not in custody during questioning even though postal inspectors confronted her with discrepancies in her accounts, asked her point blank questions as to whether she committed the crime, challenged her answers, and attempted to discover details of the crime because there was no evidence to suggest that the inspectors would not have departed on request or allowed the postal employee to do so).

As previously discussed, Hampton voluntarily agreed to be interviewed and was specifically told prior to the interview that she was free to leave at any time, which she acknowledged that she understood. (Tr. at 25-26; Gov. Ex. 1); see Brown, 441 F.3d at 1347-48 (citation and internal marks omitted) ("Unambiguously advising a defendant that [s]he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are so extensive that telling the suspect [s]he was free to leave could not cure the custodial aspect of the interview" and if a defendant said [s]he "understood the officers' advise that [s]he was . . . free to leave," that would "strengthen[] the force of the instructions."). Despite Hampton's arguments to the contrary, the atmosphere was non-coercive and though it was dark outside, the parking lot, which was a familiar and neutral surrounding for Hampton, was well-lit, the agents did not brandish any weapons, and Hampton was never physically restrained at any point during the encounter. (Tr. at 22-23, 29, 34-35, 45-46, 76, 78-79, 94, 98-100, 112, 115-16). Although Agent Williams' became "displeased" after discovering that evidence had been removed from Hampton's vehicle, see (Tr. at 36, 85-87, 98-99), her advisement that Hampton's actions could result in criminal charges did not convert the encounter into a custodial interrogation. Indeed, Agent Williams never actually advised Hampton that she was under arrest or threatened her with arrest, and in fact, she was permitted to

leave without hindrance at the conclusion of the interview.[28]  (Tr. at 40-41, 49); <u>see</u>

<u>United States v. Galceran</u>, 301 F.3d 927, 931 (8th Cir. 2002) (per curiam) (citation

omitted) ("Lack of arrest is a 'very important' factor weighing against custody.").

In short, there is simply no evidence that Hampton was physically restrained in any

manner or that she felt compelled to stay until the questioning had been completed,

and the Court finds that Hampton's freedom of movement was not restrained at any

point during the encounter to the degree associated with a formal arrest. <u>See</u> <u>United</u>

<u>States v. Muegge</u>, 225 F.3d 1267, 1269-71 (11th Cir. 2000) (per curiam); <u>United States</u>

<u>v. Augustin</u>, Criminal Case No. 1:11–CR–41–AT–LTW, 2011 WL 5358526, at *3 (N.D.

Ga. Aug. 19, 2011), adopted by 2011 WL 5331743, at *5 (N.D. Ga. Nov. 4, 2011);

<u>Martinez-Leal</u>, 2011 WL 3328907, at *17.  Accordingly, the agents were not required

to provide Hampton with <u>Miranda</u> warnings prior to interviewing her as she was

not in custody for purposes of <u>Miranda</u>.

> **b.**   <u>**Hampton freely and voluntarily made statements to the agents**</u>

Hampton also argues that the statements she made after the initial search of

her vehicle must be suppressed because they were not voluntarily rendered.  [Doc.

31 at 30-32].  In particular, Hampton contends that Agent Williams "threatened,

coerced and intimidated [her] into giving the statements."  [<u>Id.</u> at 32].  The Court

---

[28] In fact, rather than threaten Hampton with arrest, Agent Williams simply advised her that she would seek a subpoena for her cell phone records in order to find out who had retrieved the priority mail box from her vehicle.  (Tr. at 36-37, 86).

finds, however, that the totality of the circumstances show that Hampton's statements were voluntary.

Aside from the mandates of <u>Miranda</u>, whether a statement was voluntarily given must be examined in light of the totality of the circumstances.  <u>United States v. Shepherd</u>, Criminal Case No. 1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011) (<u>citing Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973); <u>Hubbard v. Haley</u>, 317 F.3d 1245, 1252 (11th Cir. 2003)).  "This totality of circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'"  <u>United States v. Villaverde-Leyva</u>, Criminal Action File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011) (citation omitted).  "Among the factors the Court must consider are the defendant's intelligence, the length of [her] detention, the nature of the interrogation, the use of any physical force against [her], or the use of any promises or inducements by police."  <u>Id.</u> (citations omitted).

The focus of the voluntariness inquiry is whether the defendant was coerced by the government into making the statement:  "[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  <u>Moran v.</u>

Burbine, 475 U.S. 412, 421 (1986); see also United States v. Cordova, No. 1:09–CR–475–WSD–CCH–5, 2011 WL 5325522, at *11 (N.D. Ga. Nov. 3, 2011), adopted at *2. "Those cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'" United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted). Because Hampton contends that her statements were coerced, the government bears the burden of proving by a preponderance of the evidence that her statements were in fact voluntarily given. See Connelly, 479 U.S. at 168.

In this case, all of the factors point in the direction of voluntariness. Hampton was only interviewed for approximately fifteen to twenty minutes prior to the initial search of the vehicle, and she remained at the post office beyond that point after asking Salsbury to return the priority mail box that Hampton had instructed her to remove from her vehicle. (Tr. at 32, 37, 41, 67, 69, 72, 82, 89, 114); see Martin v. Wainwright, 770 F.2d 918, 927 (11th Cir. 1985), modified on other grounds, 781 F.2d 185 (11th Cir. 1986) (no coercion in spite of 5 hours of interrogation). In fact, during

the time the agents were awaiting Salsbury's return, Hampton provided the agents

with a written statement that she acknowledged was freely, knowingly, and

voluntarily rendered, see (Tr. at 47-48; Gov. Ex. 7), and the agents did not further

question her, (Tr. at 41). Despite Hampton's arguments, see [Doc. 31 at 31], there is

no evidence that the agents threatened Hampton in any manner,[29] or otherwise

applied force to her during the encounter, and she was not placed in handcuffs or

restrained in any way, (Tr. at 22-24, 27, 29, 34-35, 40-41, 45-46, 78-79, 98-99, 101, 108-

09, 113-16, 125-26). There is also no evidence that the agents made any promises or

inducements to obtain Hampton's statements. (Tr. at 23, 35, 46, 108; Gov. Exs. 3 &

7). During the encounter, which took place in a familiar environment, Hampton

never showed a desire to end the questioning and never indicated that she did not

understand the questions she was being asked. (Tr. at 23-24, 27, 46, 99, 109).

Considering the totality of the circumstances, there is no basis for concluding that

---

[29] Hampton contends that Agent Williams' statement that she would obtain
a subpoena for her cell phone records caused her "to speak about the box, her
actions in relation to taking the coupons and her actions in having the box removed
when she clearly did not otherwise intend to do so." [Doc. 31 at 32]. However,
merely advising a defendant of viable legal options, which is exactly what Agent
Williams did here, does not render a confession involuntary. See United States v.
Iglesias, 881 F.2d 1519, 1522 (9th Cir. 1989); see also United States v. Dadd, 963 F.2d
380, 1992 WL 107356, at * 5 (9th Cir. 1992) (unpublished). "While [Agent Williams']
raised voice may have unsettled [Hampton], [Agent Williams] never threatened or
used physical violence" and "merely yelling once or twice, or 'getting in the face' of
the defendant, does not reach the degree of physical coercion or trickery by
authorities sufficient to render a statement involuntary." United States v. Wylie, No.
3:05CR353, 2006 WL 1431656, at *4 (W.D.N.C. May 19, 2006) (citation omitted).

the entire sequence of events brought about involuntary statements.  See United States v. Jones, 359 F.3d 921, 923-24 (7th Cir. 2004) (finding postal employee's confession voluntary where inspector questioned employee with a raised voice for approximately one hour while a second inspector was visibly armed); Gaddie, 2008 WL 1995081, at *3 (finding postal employee's confession voluntary where he was questioned at the post office and the record showed that there were no threats or promises made and employee was not denied of any physical necessities). Therefore, Hampton's motion to suppress statements made on November 30, 2010, is due to be denied.

**2.     _Statements made to Calloway on December 30, 2010_**

Hampton contends that any statements she made to Calloway on December 30, 2010, should be suppressed because "there is no evidence in the record to establish that [she] rendered her statements to supervisor [] Calloway freely and voluntarily," and "it is entirely possible that the statements were tainted by duress associated with prospective economic or job repercussions."   [Doc. 31 at 34]. Hampton asserts that the statements she made to Calloway may be protected under Garrity v. New Jersey, 385 U.S. 493 (1967), because her statements may have been rendered under the belief that she would suffer adverse job consequences if she did not speak with Calloway and she therefore requests that a hearing be held in order to determine the voluntariness of these statements.  [Id. at 34].

"Under *Garrity*, when an individual is compelled to give testimony to his public employer, and thus waive his Fifth Amendment protections, any statements given in the course of the compelled interview cannot be used in a future prosecution." United States v. Holland, 417 F. App'x 359, 360 (4th Cir. 2011) (per curiam) (unpublished) (citation omitted). "[I]t is the defendant's initial burden to show that the statements at issue are entitled to protection under Garrity," United States v. Burge, No. 08 CR 846, 2009 WL 2972915, at *3 (N.D. Ill. Sept. 11, 2009), and Hampton has not met that burden in this case, see United States v. Moten, 551 F.3d 763, 766 (8th Cir. 2008) (noting that only after a defendant demonstrates that she was compelled to testify by her government employer must the government then show that any evidence used or derived has a legitimate source independent of the compelled testimony); United States v. Cook, 526 F. Supp. 2d 1, 6-7 (D.D.C. 2007) (citation omitted) (noting that to make a Garrity claim, a defendant must first show that he was put "between the rock and the whirlpool" by having to choose between incriminating himself or losing his job).

Hampton's motion to suppress statements specifically mentioned the Calloway interview of December 30, 2010, along with the interview agents conducted on November 30, 2010, but she argued only that in order to use the statements, the government "must prove that the statements were made voluntarily and that they were not obtained in violation of Miranda requirements." [Doc. 9 at

2].  At the outset of the evidentiary hearing, the prosecutor asserted that the Calloway interview was an administrative undertaking and was not done at the instruction of law enforcement and no custodial interrogation occurred.  (Tr. at 7). Hampton's counsel responded that it was the government's burden to demonstrate the voluntariness of the Calloway statement if the government intended to use it, but counsel did not raise any Garrity issue.  (Tr. at 8).  Agent Williams testified at the evidentiary hearing that law enforcement agents did not direct Calloway to interview Hampton or participate in the December 30, 2010, interview.  (Tr. at 31-32). On cross-examination, Hampton's counsel asked Agent Williams if Calloway was a manager at the post office, but he did not question Agent Williams about the circumstances of the Calloway interview.[30]  (Tr. at 92).  Hampton offered no evidence regarding the circumstances of the Calloway interview at the evidentiary hearing, nor did she request an opportunity to present any evidence on the Garrity issue now raised in her post-hearing brief.  Accordingly, the Court finds that Hampton failed to satisfy her initial burden of showing that the statements she made to Calloway are entitled to protection under Garrity.  See Cook, 526 F. Supp. 2d at 6-7; United States v. Cooper, 269 F. App'x 253, 254 (4th Cir. 2008) ( per curiam) (unpublished) (no Garrity issue presented where "there was no evidence that

---

[30] Hampton's counsel cross-examined Agent Williams about the difference between a Miranda form and a Garrity form, but not in connection with the Calloway interview.  See (Tr. at 81).

[defendant] was told that if he did not cooperate by answering the questions of postal inspectors, he would be fired.").

As for Hampton's arguments regarding the voluntariness of her statements to Calloway, "voluntariness is not an issue when the admissions are made to private individuals." United States v. Eide, 875 F.2d 1429, 1434 (9th Cir. 1989). Indeed, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" Connelly, 479 U.S. at 167. That is, "[a] defendant's Fifth Amendment rights are generally not implicated with respect to incriminating statements made to private persons in the absence of police subterfuge or intimidation," and the "record is devoid of any evidence of police subterfuge or intimidation in this case." United States v. Kopp, No. 00CR0189, 2005 WL 839672, at *13 (W.D.N.Y. Apr. 11, 2005); see also United States v. White, 846 F.2d 678, 688-89 (11th Cir. 1988) (alterations in original) (citations and internal marks omitted) ("The Supreme Court has emphasized that [t]he sole concern of the Fifth Amendment . . . is governmental coercion" and "the actual inquiry must be directed toward determining whether the Government, or its agent, coerced a confession.").

The testimony at the evidentiary hearing established that OIG agents were not involved in the December 30, 2010, interview in any way and that law enforcement did not direct Calloway to conduct this interview and in no way participated in this interview. (Tr. at 31-32, 101). In fact, Agent Williams even testified that she was

unaware that such an interview had taken place between Calloway and Hampton. (Tr. at 31-32). Thus, Hampton's motion to suppress her statements made to Calloway on December 30, 2010, is due to be denied.[31] Eide, 875 F.2d at 1434. Accordingly, it is hereby **RECOMMENDED** that Hampton's motion to suppress statements, [Doc. 9], be **DENIED**.

## C.    Search of Hampton's Vehicle

### 1.    *Consent to Search*

"One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989) (citations omitted); see also Schneckloth, 412 U.S. at 219; United States v. Emanuel, 440 F. App'x 881, 883-84 (11th Cir. 2011) (per curiam) (unpublished); United States v. Reynolds, 526 F. Supp. 2d 1330, 1336 (N.D. Ga. 2007). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice."

---

[31] Moreover, Hampton's argument that the statements she made during the Calloway interview should be suppressed for failure to comply with Miranda is without merit since Hampton has not shown that it was a custodial interview, and in any event, the record shows that law enforcement agents had no role in Calloway's interview of Hampton, and "[g]overnment employees who do not perform law enforcement functions are not subject to the requirements of Miranda," United States v. Pirtle, 158 F. App'x 878, 879-80 (9th Cir. 2005) (unpublished) (citation omitted) (civilian post office manager "was not a law enforcement agent and was not required to give Miranda warnings prior to her conversation with [defendant].").

_Garcia_, 890 F.2d at 360 (citation omitted); see also United States v. Crump, Criminal

Action File No. 4:10–CR–032–HLM–WEJ, 2011 WL 6153106, at *6 (N.D. Ga. Nov. 21,

2011), adopted by 2011 WL 6179211, at *8 (N.D. Ga. Dec. 12, 2011); United States v.

Teague. No. 2:10–CR–006–RWS–SSC, 2010 WL 6529640, at *19 (N.D. Ga. Nov. 12,

2010), adopted by 2011 WL 1497876, at *1 (N.D. Ga. Apr. 19, 2011).

The government bears the burden of proving that consent was voluntary,

United States v. Tovar-Rico, 61 F.3d 1529, 1536 (11th Cir. 1995), and voluntariness

of consent is determined on the basis of the totality of the circumstances, see

Schneckloth, 421 U.S. at 227; Reynolds, 526 F. Supp. 2d at 1337.  Relevant factors

include the presence of coercive police procedures, the extent of the person's

cooperation with the officer, the person's awareness of his or her right to refuse

consent, the person's education and intelligence, and the person's belief that no

incriminating evidence will be found.  United States v. Purcell, 236 F.3d 1274, 1281

(11th Cir. 2001).

Agent Williams first obtained the verbal consent of Hampton to search her

vehicle and then presented Hampton with a Consent to Search form in which

Hampton acknowledged by her signature that she had been informed of her right

to refuse a vehicle search absent a search warrant and that she had the right to refuse

to consent to such a search, but that she was nonetheless authorizing the agents to

conduct a complete search and to seize mail matter or other property relating to mail theft from her vehicle. (Tr. at 30, 32, 34-35, 78, 82; Gov. Ex. 3). Additionally, Hampton acknowledged that her written consent was being given voluntarily and without any threats or promises of any kind. (Gov. Ex. 3). Up to this point, Agent Williams had spoken to Hampton in a calm voice and Hampton appeared to understand everything she was being told and did not appear to be under the influence of any drugs or alcohol. (Tr. at 23-24, 27, 109). Hampton had not been placed under arrest, had not been restrained in any way, was not handcuffed, beaten, or promised anything in return for her consent, and no weapons had been displayed to her. (Tr. at 29, 34-35, 78-79).

Hampton apparently concedes that the initial search of the vehicle was proper pursuant to her voluntary consent, <u>see</u> [Doc. 31 at 35-36],[32] and the evidence presented at the hearing shows that Hampton's consent "was voluntarily given and was not the result of coercion, either expressed or implied," <u>United States v. Suarez</u>, 694 F. Supp. 926, 939-40 (S.D. Ga. 1988). However, Hampton argues that her "consent to search was tied to the circumstance where she knew no items which might be considered contraband would be found in her vehicle" and that she

_____

[32] Hampton argues that the initial consent to search is tainted due to her unlawful seizure, <u>see</u> [Doc. 31 at 36], but as already discussed, Hampton was never unlawfully seized during the encounter.

therefore "only consented once to an entry into her vehicle, when she knew that [Salsbury] had removed the box," but that she "did not render a voluntary consent which applied to the second entry and search of her vehicle." [Doc. 31 at 35-36]. Hampton's argument in this regard, however, ignores the fact that Hampton, who was present during both searches of her vehicle, never objected to either search of her vehicle or sought to limit or rescind her consent in any way.  (Tr. at 42, 46, 90, 99).

"When a citizen gives [her] voluntary go-ahead to a search, and [s]he never limits or revokes [her] consent, the search is objectively 'reasonable' based on the citizen's voluntary consent."  United States v. Buckingham, No. 1:04-CR-10015-T, 2006 WL 1174471, at *14 (W.D. Tenn. Apr. 30, 2006).  Although Hampton argues that her consent was tied to her belief that there would be no incriminating evidence found in her vehicle, "the defendant's belief that no incriminating evidence [would] be found" is only one factor to be considered and is not dispositive.  United States v. Brown, No. CR405-280, 2006 WL 1835006, at *4 (S.D. Ga. July 3, 2006). Furthermore, "the actual subjective state of mind at the time a defendant gave [her] consent is not determinative; our focus, rather, is on how a reasonable person could have perceived [her] state of mind at that time."  United States v. Soto, No. 07-CR-0223(PJS/JSM), 2007 WL 3120816, at *9 (D. Minn. Oct. 23, 2007), adopted at

*1 (citation and internal marks omitted). "Thus, the Fourth Amendment requires only that the police reasonably believe the search to be consensual." United States v. Cedano-Medina, 366 F.3d 682, 685 (8th Cir. 2004) (citations and internal marks omitted).

Considering the totality of these facts and circumstances, and comparing this encounter to more coercive circumstances that have nonetheless been found to be consensual, the Court finds that Hampton freely and voluntarily consented to both searches of the vehicle. See United States v. Brown, 223 F. App'x 875, 880 (11th Cir. 2007) (per curiam) (unpublished) (finding consent to search voluntary despite the fact that officer had drawn his weapon and placed defendant in handcuffs); United States v. Hidalgo, 7 F.3d 1566, 1567, 1571 (11th Cir. 1993) (finding consent voluntary where defendant was arrested by law enforcement who had broken into his home early in the morning, woke him up, and forced him to the ground at gunpoint); Garcia, 890 F.2d at 361 (holding consent voluntary where defendant was arrested by numerous officers, was patted down for weapons, was handcuffed, and where the officers' refused to accept defendant's conditional consent to search and threatened to obtain a search warrant if he did not consent to a full search); United States v. Espinosa-Orlando, 704 F.2d 507, 513 (11th Cir. 1983) (holding consent voluntary despite fact that individual was arrested at gunpoint by four agents, forced to lie on

the ground near the roadway, and provided consent while one officer had his weapon drawn).

2. *Automobile Exception*

Even if the Court concluded that Hampton did not voluntarily consent to the second search of the vehicle, the search would still be lawful pursuant to the automobile exception. In <u>Arizona v. Gant</u>, 556 U.S. 332 (2009), the Supreme Court "affirmed the viability of the probable cause exception for automobiles." <u>United States v. Goldsmith</u>, Criminal Action No. 4:09cr94, 2009 WL 4884408, at *3 (E.D. Tex. Dec. 10, 2009), adopted at *1 (citation omitted). "Under the automobile exception, agents may conduct a warrantless search of a vehicle if (1) the vehicle is readily mobile (i.e., operational); and (2) agents have probable cause to believe the vehicle contains contraband or evidence of a crime." <u>United States v. Tamari</u>, 454 F.3d 1259, 1261 (11th Cir. 2006) (citations omitted).[33] "The legality of a warrantless automobile search is based on the existence of probable cause to believe that the automobile is carrying contraband subject to forfeiture under the law, and the difficulties of

---

[33] "[T]he mobility of an automobile is exigency enough," <u>United States v. Nixon</u>, 918 F.2d 895, 903 (11th Cir. 1990), and mobility is satisfied merely if "the automobile is operational," <u>United States v. Watts</u>, 329 F.3d 1282, 1286 (11th Cir. 2003) (per curiam). Hampton was approached while she was seated in the driver's seat of her vehicle and she later left in that vehicle after the agents issued her a citation. <u>See</u> (Tr. at 49, 105). Thus, the mobility requirement has been satisfied in this case.

securing a moveable vehicle while a warrant is obtained." United States v. Thomas, 536 F. Supp. 736, 742 (M.D. Ala. 1982); see also Chambers v. Maroney, 399 U.S. 42, 51-52 (1970); United States v. Alexander, 835 F.2d 1406, 1409 (11th Cir. 1988).

Probable cause to search exists "'when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband.'" Alexander, 835 F.2d at 1409 (alteration in original) (quoting United States v. Clark, 559 F.2d 420, 424 (5th Cir. 1977)).  In determining whether probable cause exists, the Court "may examine the collective knowledge of the officers 'if they maintained at least a minimal level of communication during their investigation.'" United States v. Olmedo, 552 F. Supp. 2d 1347, 1357 (S.D. Fla. 2008), adopted at 1350 (citation omitted) (quoting United States v. Willis, 759 F.2d 1486, 1494 (11th Cir. 1985)).  Thus, under the automobile exception, a warrantless search of a vehicle does not violate the Fourth Amendment "if the vehicle is operational and 'under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found' in the vehicle." Tamari, 454 F.3d at 1262  (internal marks omitted) (quoting United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002)).  "A police officer's subjective reasons for a search do not control the legal justification for his actions, as long as objective circumstances justify the search." United States v.

<u>Lisbon</u>, Criminal File No. 1:10–CR–251–10–TWT, 2011 WL 6014453, at *26 (N.D. Ga. Dec. 2, 2011), adopted at *1 (citations omitted).

In this case, based on all the facts and circumstances known to the agents at the scene, the warrantless search of Hampton's vehicle was supported by probable cause to believe it contained evidence of mail theft. The OIG agents had received information that Hampton was stealing mailers from the post office and after conducting surveillance, they observed Hampton and Poole extracting mail from UBBM bins, exiting the building with a priority mail box full of the mail they had just been seen extracting, and Hampton entering her vehicle. (Tr. at 11-12, 15-18, 56, 61). Subsequently, Agent Williams looked inside of Hampton's vehicle and observed in plain view the priority mail box in the backseat of Hampton's vehicle. (Tr. at 20-21, 83-84). Though it was dark and Hampton's vehicle had tinted windows, the lighting in the dock area allowed Agent Williams to see that the priority mail box contained Kohl's gift card mailers. (Tr. at 21, 39, 45, 83, 96). After the agents discovered that the priority mail box had been removed from the vehicle and confronted Hampton, she called Salsbury and told her to return it, and the agents were subsequently notified that Salsbury had returned the priority mail box to Hampton's vehicle. (Tr. at 42-43, 89-90). Taken together, all of these facts and circumstances provided probable cause to believe that evidence of mail theft would

be found within the vehicle when the agents searched it.  See United States v. Richard, Criminal Action No. 4:09cr37, 2009 WL 2169892, at *7 (E.D. Tex. July 20, 2009), adopted at *1 ("[O]fficers who participated in the investigation, surveillance, arrest, and search of [the defendant's] vehicle had probable cause to believe that [evidence of identity theft and credit card fraud] was in [the] vehicle."); see also United States v. Trevino, No. 2:10-cr-70-FtM-36SPC, 2010 WL 4023434, at *5 (M.D. Fla. Sept. 23, 2010), adopted by 2010 WL 4000611, at *1 (M.D. Fla. Oct. 13, 2010) (finding search of vehicle lawful pursuant to the automobile exception where officers knew that defendant had just obtained a package from her mailbox that was the subject of a controlled delivery and observed her place the package in her vehicle and drive off, stating, "Not only did a fair probability exist that the vehicle contained contraband, it was a near certainty based on the officer's observations that the package was in the car.").  Thus, the search of Hampton's vehicle and seizure of the priority mail box therefrom was also lawful under the automobile exception to the search warrant requirement.

## III.  CONCLUSION

For the foregoing reasons and cited authority, Hampton's motion to supplement the record, [Doc. 32], is **DENIED**, and it is hereby **RECOMMENDED**

that Hampton's motions to suppress evidence and statements, [Docs. 9 & 10], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 5th day of March, 2012.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE